UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONTAINMENT TECHNOLOGIES GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:07-cv-0997-DFH-TAB |
| AMERICAN SOCIETY OF HEALTH SYSTEM PHARMACISTS; GREGORY F. PETERS; MARGHI R. McKEON; and, WILLIAM T. WEISS, | ) ) ) ) ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In this diversity jurisdiction action, a manufacturer claims it was libeled by an academic journal and three authors who tested and criticized the manufacturer's product, which plays a critical role in safely packaging prescription medications for direct injections into patients.  An Indiana statute provides protection from civil liability for people who exercise their federal and state constitutional rights to free speech.  The statute, known as the "Anti-SLAPP" law (SLAPP stands for "strategic lawsuits against public participation"), serves as a bulwark against attempts to silence speakers through unjustified defamation suits.  The defendants have moved for summary judgment under the Anti-SLAPP statute, Indiana Code § 34-7-7-1 *et seq.*

The defendants published an article on a public issue, one of importance to the pharmacy community dealing with the performance of devices used to compound drugs in a sterile setting. The article, "Potential for airborne contamination in turbulent- and unidirectional-airflow compounding aseptic isolators," appeared in the March 15, 2007 issue of the American Journal of Health-System Pharmacy. The journal is published by defendant American Society of Health System Pharmacists (ASHP). The authors are defendants Gregory F. Peters, Marghi R. McKeon, and William T. Weiss.

The court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff Containment Technologies Group is an Indiana corporation with its principal place of business in Indiana. Defendant ASHP is a Maryland not-for-profit corporation with its principal place of business in Maryland. Authors Peters and McKeon are citizens of Wisconsin. Weiss is a citizen of Minnesota. The amount in controversy exceeds $75,000. Containment Tech originally filed its complaint in Indiana state court. Defendants properly removed under 28 U.S.C. § 1441.

Defendants have filed motions to dismiss under Indiana's anti-SLAPP law. The motions are treated as motions for summary judgment under both the terms of the Indiana statute, see Ind. Code § 34-7-7-9(a)(1), and the Federal Rules of Civil Procedure, thus avoiding any *Erie Railroad* debate over whether that particular provision is substantive or procedural. ASHP has filed its own motion. The three authors have combined to file their own motion.

As explained below, the Indiana residence of the alleged victim, Containment Tech, weighs in favor of applying Indiana law.  Under Indiana law, defamation actions based on speech about matters of public concern require proof of "actual malice" – either knowledge of actual falsity or reckless indifference to truth or falsity.  Containment Tech cannot meet that standard.  The authors' article is sharply critical of Containment Tech's product, but the undisputed facts show that Containment Tech cannot show that the authors or the publisher knowingly or recklessly published any false information.  The law leaves this dispute between the authors and Containment Tech to the realm of open scientific debate.  A suit for defamation merely chills attempts at open academic debate and genuine sharing of information.  Containment Tech's defamation claims therefore must be dismissed.  Pursuant to the anti-SLAPP statute, the court will also award attorney fees to all defendants.

*Undisputed Facts*

The facts set forth in this entry are not necessarily true in an objective sense, but pursuant to federal standards for summary judgment, they reflect the evidence in the light reasonably most favorable to plaintiff Containment Tech, giving it the benefit of conflicts in the evidence and reasonable inferences from the evidence.  Where defendants have established a fact as beyond reasonable dispute, the court treats the fact as true.

Compounding aseptic isolators ("CAIs") are devices used in pharmacy and nursing settings to ensure that medications will be sterile. In particular, CAIs are used for preparing medications that are administered by injection directly into the vascular or central nervous system of the patient. Weiss Decl., Ex. A. Since these injections immediately enter the blood stream, outside contaminants can cause serious problems. CAIs use airflow to help keep a facility sterile while the medications are being prepared.

The defendants' article reported test results for four CAIs that cause air to flow in one direction and one CAI (Containment Tech's product) that uses a turbulent or multi-directional airflow. The authors recommended the four unidirectional-airflow devices but not plaintiff's turbulent-airflow device. The defendant authors entered an evolving field of research as these newer CAI devices were being standardized. The United States Pharmacopeia issued a guidance document "USP 797" in January 2004 for compounded sterile preparations, but it did not create uniform industry standards other than a requirement that the devices create an environment with "at least ISO Class 5 quality of air" to prepare the compounding sterile preparations. Weiss Decl., Ex. A. The majority of isolators are unidirectional, creating a continuous flow of air moving in one direction to remove contaminants. A turbulent airflow brings air into the area to dilute contaminants in the area, thus reducing the concentration. Dkt. 114, Ex. T at 3-4.

Containment Tech developed a turbulent-airflow device called the MIC (Mobile Isolation Chamber). Containment Tech's MIC device successfully complied with USP 797. After the creation of that standard, however, some experts in the field argued that compliance should be tested not at rest but in "dynamic" conditions, as the device is supposed to work in the field. 64 Am. J. Health-Syst. Pharm. 855. In fact, the updated 2008 USP 797 requires CAI devices to be placed in a buffer area unless they can maintain the ISO Class 5 standard "during dynamic operating conditions." Weiss Decl., Ex. B at 23.

Defendant Peters is the majority owner, president, and CEO of Lab Safety Corporation, which provides "testing, design and certification of engineering controls for clean spaces and containment systems." Peters Decl. ¶ 2. He was the lead writer on the defendants' paper and designed the study. *Id.* at ¶ 7. Defendant McKeon is the quality assurance manager of Lab Safety, where she has worked since 1989. McKeon Decl. ¶ 2-3. Defendant Weiss is a pharmacist. For the past ten years, he has been the pharmacy production manager for the Mayo Clinic in Rochester, Minnesota. Weiss Decl. ¶ 3.

The authors selected five CAI devices for testing: four unidirectional-airflow devices and Containment Tech's turbulent-airflow MIC device. Two unidirectional CAIs were from NuAire, Inc. One each came from Germfree, Inc. and Baker Company. The five devices were put through a series of three tests. The first test involved a smoke tracer to mimic dynamic conditions. The second involved a

"worst case" with surrogate compounding materials placed on the critical work surface.  Alcohol drying times were also taken.  The third phase involved filling the device with smoke and timing how long it took to create ISO Class 5 operating conditions.  See Article at 626-28.

In testing the devices, the authors tested Containment Tech's MIC device that was used by the Gonda Outpatient Procedure Center at the Mayo Clinic.  The other four devices were all tested together at Lab Safety.  The undisputed facts provide a simple explanation for the difference.  Containment Tech refused to provide the authors with a sample MIC device with appropriate protocols, while the four unidirectional-airflow devices were all provided by the manufacturers.  As a result, the test was not done with full access to Containment Tech's recommended procedures and protocols.  The Containment Tech MIC device used at the Mayo Clinic included some discoloration that Weiss thought might be rust.  Weiss Dep. 81-83.  The unit did not have an updated certification record, which Minnesota state law requires that these devices undergo every six months.  Someone at Mayo told Peters that an unidentified "qualified independent testing company" had re-certified it in February 2006.  Peters Decl. ¶ 27.  The MIC unit complied with the manufacturer-required baseline ISO Class 5 when in a static condition.  Peters Decl. ¶ 26.  After the authors' tests, Weiss had the Containment Tech device tested by CSI Testing, which found that it met certification standards.  Weiss Decl. ¶¶ 24-25.

The results of the tests run by the authors were overwhelmingly poor for Containment Tech's turbulent-airflow CAI.  In the first test, the four unidirectional CAIs all were successful, while "at no time during phase 1 testing did the turbulent CAI tested achieve an ISO class 5 operating condition at the critical orifice."  Article at 628.  These results were repeated in the second phase.  The added alcohol drying test showed drying times of less than or equal to 16 seconds for the unidirectional CAIs, but six minutes for Containment Tech's CAI.  In the third phase, which measured the length of time it took to clean out the system, the unidirectional CAIs ranged from 31 to 70 seconds.   The test of the Containment Tech device was stopped when it did not reach ISO class 5 operating conditions after seven minutes.  Based on these results, the authors concluded: "The performance of four unidirectional-flow CAIs supports their use in pharmacy and nursing CSP operations, whereas the performance of one turbulent-flow CAI does not."  Article at 630.

Complicating the litigation, the authors no longer have access to the written protocols that they followed.  They have lost the "raw data test folder," which includes data test strips from the particle counter as well as contemporaneous notes.   The results had been recorded elsewhere (allowing the article to be written), but the protocols and design are missing with the raw data folder.  Peters did recover the actual data, although not until August 2008.  Peters Suppl. Decl. ¶ 4.  Peters has no explanation for what happened to the raw data test folder, and he and McKeon both testified that they were surprised at its disappearance.

Peters submitted the first draft of the article to ASHP electronically in February 2006. Dr. Guy Hasegawa was assigned to evaluate the manuscript. Dr. Hasegawa has been employed by ASHP since 1988, and since 1994 he has been the Senior Editor of the American Journal of Health-System Pharmacy. Hasegawa Decl. ¶ 4. He determined that the article would be important because "pharmacists (and other health-care professionals) working in hospitals and other health systems are responsible for preparing medicines that will be injected into patients." Hasegawa Decl. ¶ 8. Dr. Hasegawa's initial review was not a substantive review of content. He established that he needed technical assistance to evaluate and edit the manuscript. Hasegawa Decl. ¶ 12. Dr. Hasegawa did not review the "conflict of interest" submission, which stated no conflicts. Peters and his company Lab Safety had previously had a relationship with NuAire, which manufactured two of the unidirectional CAIs tested. This relationship was fully disclosed in the final article.[1]

Dr. Hasegawa sought out peer reviewers, as was consistent with the ASHP Journal's policy. Peters submitted proposed peer reviewers through the online system. Dr. Hasegawa testified that he did not even check Peters' proposed names

---

[1]The article stated: "A relationship, dissolved in February 2006, existed between Valiteq (a division of Lab Safety Corporation) and Scientific Visions (a division of NuAire, Inc., manufacturer of two of the compounding aseptic isolators [CAIs] tested in this study). The relationship involved Scientific Visions' distribution of Valiteq training literature and media-fill products only and was unrelated to the marketing, sale, or use of CAIs or laminar-airflow workstations (LAFWs). Neither Lab Safety Corporation nor the Mayo Clinic is affiliated with any CAI or LAFW manufacturer or distributor."

because of Dr. Hasegawa's own "familiarity with persons with expertise in the area of sterile compounding." Hasegawa Decl. ¶ 14. In most cases, the ASHP Journal enlisted two peer reviewers. Here, Dr. Hasegawa sent out four requests "because the manuscript addressed a highly technical topic, and I suspected that one or more of the prospective reviewers might not be able to submit comments because of their busy schedule." Hasegawa Decl. ¶ 16. Three of the selected reviewers agreed to review the article. The fourth recommended a different expert who also agreed to serve as a peer reviewer.

The four reviewers all acknowledged the significance of the manuscript. Reviewer 1 called it "a critically needed article to educate pharmacists and technicians on the performance attributes of isolators." Reviewer 2 wrote that the article "should be a very high priority paper for publication." Reviewer 3 wrote that the article "covers a very important topic and I believe is critically important work . . . This needs to get out to the pharmacy community." Reviewer 4 wrote that the article "is a badly needed piece of information." Hasegawa Decl, Ex. A.

The peer reviewers questioned the writing and other stylistic choices. Reviewer 3 expressed concern with some of the authors' sourcing. Only one reviewer, Reviewer 3, raised a concern with methods, questioning the use of the alcohol drying times and arguing that it was not "cut and dried and will only take away from the credibility of the rest of the work." *Id.* On March 10, 2006, Dr. Hasegawa presented the manuscript and peer review comments to ASHP Journal's

Manuscript Development Group.  The group agreed to publish the article, pending satisfactory revisions by the authors.  Hasegawa Decl. ¶ 21.

Peters was notified of this tentative acceptance.  He returned a revised manuscript in May 2006.  He included a point-by-point response to the concerns raised by the peer reviewers.  Dr. Hasegawa found the response satisfactory and formally accepted the article for publication.  Hasegawa Decl. ¶ 24.  In June 2006, the article was waiting in line for final attention at the ASHP Journal when Peters made a new proposal.  He decided that he wanted the manufacturers to review and comment on the manuscript.  The ASHP Journal refused to get involved.  Dr. Hasegawa feared that "injured" companies "will pester us relentlessly and perhaps even threaten legal action."  He chose to rely on the "good faith effort" that is the peer review process and suggested that "authors are ultimately responsible for what they say, and they must be able to take their lumps after publication." Hasegawa Decl., Ex. D.  Peters decided to seek the information himself and requested that publication be put on hold.

For the sake of this dispute, Peters' communication with Containment Tech's Technical Director Hank Rahe is all that is relevant.  Rahe had initially refused a request to provide information about the MIC device and the device itself before the studies were done.  Peters tried again to procure a new MIC unit to be tested at Lab Safety, where he had tested the four unidirectional-airflow CAIs. Peters also offered to provide Containment Tech with the current draft of the

article if Containment Tech signed a confidentiality agreement, which the other three manufacturers had all agreed to do.  Peters Decl. ¶ 36.

Peters and Rahe traded emails throughout the summer of 2006.  Rahe asserted that he was particularly hostile towards Peters because of Peters' connection with NuAire.  Additionally, Peters did not provide the protocols used in the testing of Containment Tech's MIC at Mayo.  Peters responded that the protocols were in the article, which he was unwilling to share with Rahe because Rahe refused to ensure its confidentiality.  Rahe responded that in speaking of protocols:  "It is very important that specific procedures be used in transfer of non-sterile components using an airlock.  Proper training to assure reduction of micro contamination is critical.   Testing without this will lead to false conclusions."  Peters Decl., Ex. B.

On August 13, 2006, Rahe told Peters he would ask the Containment Tech board of directors to consider whether to give him access to an MIC device.  On August 28, 2006, Containment Tech president Michele Moore rejected the request.  The reasons included Peters' relationship with NuAire, Peters' "continued attempt" to gain knowledge of Containment Tech technology (including an alleged incident where Peters represented himself as an "independent reporter"), his unwillingness to provide protocols, and his "attitude towards [Containment Tech] in terms of academic and professional credentials while refusing to present your or your colleagues' credential [sic]."  Peters Decl., Ex. D.

The end of the exchange was a letter in November 2006 from Containment Tech to Peters threatening a lawsuit.  The letter also demanded that the article state that the testing on the MIC unit "was conducted without the benefit of [Containment Tech] approved protocols and training."  Peters Decl., Ex. E.  The authors made that change.  Peters testified that the litigation threats made him consider not publishing the article because, "as a small business owner, the cost of defending litigation was a very strong disincentive for me to go forward with publication of the Article."  Peters Decl. ¶ 39.

The article was published in the March 15, 2007 edition of the ASHP Journal.  Dr. Hasegawa was aware of the dispute between Peters and Rahe but still decided to publish:  "In my experience, as an editor and an author, disputes and debates about study findings are frequent in the scientific literature, and the ASHP Journal routinely publishes articles which are controversial."  Hasegawa Decl. ¶ 33.  With the large exception of this lawsuit, ASHP has received no complaints or objections about the article's methods or conclusions.  In his deposition, Richard Talley, editor of the journal, noted:  "This paper has been in the public by virtue of its being published for 18 months, and we have not had one word from readers about anything about this paper."  Talley Dep. 78.

*Choice of Law*

Before reaching the merits of the defendants' motions, the court must address a choice of state law.  Containment Tech is an Indiana company.  The article was written by the authors in Minnesota, published by ASHP's journal based in Maryland, and distributed all over the United States.  The parties' dispute over choice of law is based primarily on the differences between the Indiana and Maryland anti-SLAPP statutes.  Indiana's anti-SLAPP law applies to speech "in connection with a public issue or an issue of public interest" and provides attorney fees to a prevailing defendant.  Ind. Code §§ 34-7-7-2, -7.  Maryland's anti-SLAPP law deals only with communications dealing with government matters, and it makes no provision for attorney fee awards.  Md. Code Cts. & Jud. Proc. § 5-807.

A federal court hearing a case under diversity jurisdiction must apply the substantive law of the state in which it sits.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  If the laws of more than one jurisdiction might apply, *Erie* principles require a federal court to apply the forum state's choice of law rules.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Horn v. Transcon Lines, Inc.*, 7 F.3d 1305, 1307 (7th Cir. 1993).  In *Hubbard Manufacturing Co. v. Greeson*, 515 N.E.2d 1071 (Ind. 1987), the Indiana Supreme Court adopted a modified version of the "most significant contacts" choice of law test for tort cases.  As the court noted in *Hubbard*, where the place of the tort is significant and the place with the most contacts, that is the law to be applied.  *Id.* at 1073; see also *Jean v. Dugan*, 20 F.3d 255, 261 (7th Cir. 1994).  Here, however, the

place of the tort is not significant.  The article was published across the country, and the alleged tort occurred equally in every state.

When the place of the tort is not significant, *Hubbard* instructs a court to consider additional factors that may be more relevant, such as  where the conduct causing the injury occurred, the residences or places of business of the parties, and the place where the relationship between the parties is centered.  515 N.E.2d at 1073-74.  "These factors are not an exclusive list nor are they necessarily relevant in every case." *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004). All contacts "should be evaluated according to their relative importance to the particular issues being litigated."  *Hubbard*, 515 N.E.2d at 1074.

The Seventh Circuit applied Indiana choice of law principles to a libel case in *Jean v. Dugan*, 20 F.3d 255 (7th Cir. 1994).  There, the plaintiff claimed that he was libeled by a letter printed in a union publication.  The plaintiff lived and worked in Indiana.  The defendant was based in Illinois, and the allegedly defamatory article was distributed in Illinois, Indiana, and Iowa.  The Seventh Circuit applied the *Hubbard* test to apply Indiana law:  "Jean lived and primarily worked in Indiana; hence, the relevant community in which the alleged injury to his reputation occurred was in Indiana.  Following from this, we conclude that the 'conduct causing the injury' was not simply the publication of Dugan's articles, but, more precisely, their publication *in Indiana*."  *Id.* at 262 (emphasis in original).

Containment Tech argues against this conclusion on two grounds. First, it argues that the tort occurred in Maryland where the article was printed and notes that it would be anomalous to allow a Maryland corporation (and Minnesota and Wisconsin residents) to benefit from an Indiana law in a case where their home states' laws offer them no equivalent protection. Second, Containment Tech argues that the *Hubbard* factors counsel in favor of Maryland law. Containment Tech is wrong that defamation occurs where the material is printed and mailed. "In cases where, as here, the conduct at issue is publication, the place of injury is under most circumstances the place of publication." *Jean*, 20 F.3d at 261.

The court finds nothing odd about allowing a Maryland publisher to benefit from Indiana's anti-SLAPP statute for its activities in Indiana. Indiana could not choose to protect only Indiana publishers for similar conduct, and Indiana residents are the intended beneficiaries of the robust public debate that the anti-SLAPP law is intended to protect. In *Simon v. United States*, the Indiana Supreme Court held on a certified question from the Third Circuit Court of Appeals that Indiana choice of law rules do not include depecage (application of different states' laws to different issues), nor has Indiana adopted the policy analysis component of the Restatement (Second) of Conflict of Laws. 805 N.E.2d at 801-03. Under a different conflict of laws regime, a different result might be reached, see *Global Relief v. New York Times Co.*, 2002 WL 31045394 (N.D. Ill. Sept. 11, 2002) (applying Illinois choice of law to find that defamation action proceeded under Illinois law but that defenses to defamation, namely anti-SLAPP, should be

considered under California law), but in Indiana, the entire defamation cause of action is considered under the same state's of laws.  Because the defamation claim is properly heard under Indiana law, the anti-SLAPP defense under Indiana law also applies.

Since the alleged injury here would have been felt most severely in Indiana, Indiana law governs the dispute.  The *Hubbard* factors are merely illustrations of the type of factors to consider.  Given the diverse placement of parties, the fact that the alleged injury was felt most strongly in Indiana counsels in favor of Indiana law.  This conclusion applies to both ASHP and the authors.  See *Jean*, 20 F.3d at 262.

Containment Tech argues in the alternative that the Indiana anti-SLAPP law does not apply because it conflicts with Federal Rule of Civil Procedure 56.  In general, a federal court sitting in diversity will apply state substantive law but use federal procedural law.  See *Hanna v. Plumer*, 380 U.S. 460, 471 (1965) (holding that Federal Rule of Civil Procedure 4 for personal service of summons controlled diversity action in federal court).  Unlike the service of process rule in *Hanna*, however, the anti-SLAPP statute has a distinctly substantive flavor.  The anti-SLAPP statute provides a complete defense to defamation and also provides the

remedy of attorney fees to a victorious defendant.   These are substantive

provisions of Indiana law that govern in this diversity jurisdiction case.[2]

The court applies both Rule 56 of the Federal Rules of Civil Procedure and

the substantive portions of the Indiana Anti-SLAPP statute, including the

substance of the defense and the attorney fee remedy.  As Judge McKinney has

noted: "Substantively, the Act does not replace the Indiana common law of

defamation but provides simply that the movant must establish that her speech

was 'lawful.'" *CanaRx Services, Inc. v. LIN Television Corp.*, 2008 WL 2266348, at

*5 (S.D. Ind. May 29, 2008); see also *United States v. Lockheed Missiles & Space

Co.*, 190 F.3d 963, 971-73 (9th Cir. 1999) (acknowledging that California's anti-

___

[2]The one arguable exception to this analysis is the statutory directive that the motion to dismiss (which is to be treated as a motion for summary judgment) must be granted "if the court finds that the person filing the motion has proven, by a preponderance of the evidence, that the act upon which the claim is based is a lawful act in furtherance of the person's right of petition or free speech under the Constitution of the Unites States or the Constitution of the State of Indiana." Ind. Code § 34-7-7-9(d).  The Indiana Court of Appeals has read this provision as conflicting with Indiana Trial Rule 56, which sets the standard for summary judgment.  See *Shepard v. Schurz Communications, Inc.*, 847 N.E.2d 219, 224 (Ind. App. 2006).  Section 9(a)(1) directs the court to treat the motion as one for summary judgment.  This court is not persuaded that the "preponderance of the evidence" language in section 9(d) was  actually intended to conflict with the standard for summary judgment.  The two subsections can easily be reconciled. The affirmative defense under the Anti-SLAPP statute puts the burden of proof on the defendant by a preponderance of the evidence, without trying to replace the familiar standard for summary judgment.  As one of the Supreme Court's leading trilogy of summary judgment cases shows, when a court decides a motion for summary judgment or a motion under section 9, the court must be aware of which party must prove which matters by which standard of proof.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-54 (1986) (discussing application of "clear and convincing" standard of proof to motion for summary judgment in libel case). Under section 9, therefore, the issue may be phrased as whether the undisputed facts show no genuine issue of material fact on the constitutional defense, which requires the defendant to be able to reach only the level of preponderance of the evidence.

SLAPP statute and the Federal Rules "do, in some respects, serve similar purposes" but finding that it is not a "direct collision" and that the anti-SLAPP statute also serves an interest not addressed by the Federal Rules, namely protection of free speech); *Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003) ("Because California law recognizes the protection of the anti-SLAPP statute as a substantive immunity from suit, this Court, sitting in diversity, will do so as well."); *Kearney v. Foley and Lardner*, 553 F. Supp. 2d 1178, 1182 (S.D. Cal. 2008) (finding that "attorneys' fees are mandatory, and therefore, a substantive right under the anti-SLAPP statute").  For these reasons, Indiana's anti-SLAPP statute provides substantive rights of a total defense against defamation and the award of attorney fees to prevailing defendants.[3]

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could decide in favor of the non-moving party.  *Id.* at 249.

---

[3]The anti-SLAPP law also allows an award of attorney fees to plaintiff if the court finds the motion to dismiss was "frivolous" or "solely intended to cause unnecessary delay."  Ind. Code § 34-7-7-8.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and must resolve all factual disputes in that party's favor.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

*Indiana Defamation Law and the Anti-SLAPP Statute*

To prove defamation, a plaintiff must show:  (1) defamatory imputation; (2) malice; (3) publication; and (4) damages.  *Schrader v. Eli Lilly and Co.*, 639 N.E.2d 258, 261 (Ind. 1994).  "Defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Id.*  Under the United States Constitution's protection of free speech, a viable claim for defamation requires "a false statement of fact."  *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999).  "If a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the jury."  *Id.*

The anti-SLAPP statute was crafted "in furtherance of a person's right of petition or free speech" and requires a statement "in connection with a public issue or an issue of public interest."  Ind. Code § 34-7-7-2.  To qualify for

protection under the statute, the statement must have been made "in good faith and with a reasonable basis in law and fact."  Ind. Code § 34-7-7-5(2).

All defendants acknowledge that the article was published, and the motions for summary judgment do not question at this stage whether Containment Tech suffered any damages.  The defendants argue that many of the alleged defamatory statements are not actually defamatory and that they did not act with actual malice with respect to any defamatory statements.  In this context, the phrase "actual malice" refers to whether the defendant published a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), quoted in *Bandido's*, 712 N.E.2d at 456.

Before analyzing the merits of Containment Tech's claims, this court must determine what allegedly defamatory statements Containment Tech is entitled to contest.  In its briefs opposing the defense motions, Containment Tech argues that eighteen statements in the article are defamatory.  It argues that both ASHP and the authors defamed Containment Tech with each statement.  In responses to interrogatories served by Weiss, however, Containment Tech identified twenty-one allegedly defamatory statements.  Dkt. 114, Ex. J.  The response briefs include only thirteen statements that appear among the twenty-one statements in the response to interrogatories.  The statements in the response briefs are shorter and include multiple statements that are part of a single allegedly defamatory

statement in the interrogatory.  The interrogatory at issue asked Containment Tech to identify what statements in the article were false, defamatory, or both. Containment Tech presumably knew the answer to that question before it filed the lawsuit.  It responded with ten statements that were false and twenty-one that were false and defamatory.  The contested material is only one article, and Containment Tech should have known what statements were defamatory upon reading the article.  Furthermore, Rule 26 of the Federal Rules of Civil Procedure provides that a party must supplement or correct an answer to an interrogatory "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect"  Fed.R.Civ.P. 26(e)(1).

Containment Tech never amended its responses but raised the new allegedly defamatory statements for the first time in its response briefs.  Defendants were entitled to rely on Containment Tech's answer to interrogatories.  Containment Tech may not contend now that statements not noted in the responses to interrogatories are defamatory.  See *Holiday Inns, Inc. v. Robertshaw Controls* Co., 560 F.2d 856, 858 (7th Cir. 1977)(rejecting plaintiff's attempts to argue a new theory of liability at trial where it had failed to supplement its interrogatory responses); *Classic Cheesecake Co. v. JPMorgan Chase Bank*, 2007 WL 2897747, at *1 (S.D. Ind. March 19, 2007) (allowing defendant to rely on plaintiffs' interrogatory answers and finding "the mention of damages in summary judgment affidavits was not sufficient to act as a de facto amendment of the Plaintiffs' interrogatory answers").

Also, any claims based on statements that appeared in the interrogatory response but not the response briefs are waived. *Roe-Midgett v. CC Services, Inc.,* 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped argument constitutes waiver). For those reasons, Containment Tech can contest the defamatory nature of only the thirteen statements in both the interrogatory response and its brief.[4]

I.   *Defamatory Imputation*

Containment Tech presses a defamation claim against all defendants for each of the remaining thirteen allegedly defamatory statements. The claims against the authors, as the creators of the actual words, must be analyzed slightly differently than claims against ASHP, which independently read the words and decided to publish them. Nonetheless, some of the questioned statements can be dismissed across the board because they do not meet other standards of defamation. Several of the thirteen statements at issue do not amount to defamation. Eight do not show defamatory content because they are not about Containment Tech itself:

> "Because USP chapter 797 mandates that the performance of such equipment be equivalent to that of the LAFW, the CAI's operational efficiencies must be compared with those of the LAFW."
>
> "In order to represent a worst-case, in-process compounding simulation as a process qualification (PQ) in phase 2, the smoke tracer was removed from

---

[4]ASHP was also entitled to rely on Containment Tech's response to the authors' interrogatories. There would be no point in requiring different defendants to ask plaintiffs the same interrogatories.

the CAI, and surrogate compounding materials were placed onto the critical work surface via the normal antechamber interface. The unit was allowed to equilibrate for one minute with no work activity."

"The unidirectional-flow CAIs tested rapidly and reliably entrained and removed large quantities of airborne particulate contamination from the aseptic work zone, provided first air to the working materials, and facilitated the rapid drying of alcohol surface disinfectant."

"Death of the isopropyl or ethyl alcohol-saturated bacterial cell is caused by drying of the alcohol and the resulting loss of water through osmosis."

"For the purposes of this study, unbiased validation of CAI design methodology through performance relevant to the actual aseptic compounding process was necessary."

"The unidirectional-airflow CAIs tested met the laminar-airflow workstation equivalency requirements of chapter 797 of the United States Pharmacopeia, pharmaceutical aseptic processing standards, the industry standard definition of closed isolator, and the rigorous demands of pharmacy and nursing sterile compounding."

"These attributes constitute best practices and are necessary to support the aseptic compounding process in pharmacy and nursing CSP operations in accordance with closed isolator design and testing standards."

"The unidirectional-flow CAIs tested will support the optimum alcohol disinfection routine."

Containment Tech does not make a unidirectional-airflow CAI, so these statements all refer either to the competitors that were part of the study or to assumptions, conclusions, or opinions that supported the authors' conclusions. Each statement standing alone cannot be defamatory towards Containment Tech. To the extent that any of the underlying assumptions are untrue, they could lend credence to the possibility that the ultimate conclusion – Containment Tech's CAI is inferior – was defamatory. These statements themselves, however, are not. They may or may not be true, but they do not refer to Containment Tech. See

*Schrader*, 639 N.E.2d at 261 ("Defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff.").

Other statements at issue can also be dismissed because, while the statements referred to Containment Tech or its device, they have no defamatory imputation:

> "Following successful installation and operational qualifications, one turbulent-flow and four unidirectional-flow CAIs were challenged to compare the two airflow methodologies in removing airborne particulate contamination generated within the aseptic work zone."

> "Because the turbulent-airflow CAI cannot meet the operating or testing specifications of the unidirectional-airflow CAI, the manufacturer's less demanding operational qualifications of the turbulent-airflow CAI are deferred to in the CETA standard."

> "Internal pressurization of all CAIs in accordance with the manufacturer's operating specification was verified by interconnection of a water manometer as a primary standard to each CAI. Manufacturer's data were used to determine CAI process air changes per hour and antechamber purge times."

These statements refer to Containment Tech's turbulent-flow CAI, but the statements are not in any way disparaging of that product or Containment Tech. They merely describe procedural steps in the test process.  To the extent Containment Tech disagrees with them factually – questioning whether installation was "successful" in the first one, the appropriateness of using the term "CETA standard" in the second,  and whether the "manufacturer's operating specification" was accurate in the third one – the statements are in no way

defamatory. They do not say anything negative about Containment Tech. Had the final result of the paper been a recommendation of Containment Tech's MIC device, then these statements, while still potentially untrue, would not possibly be considered defamatory. Statements about the process of an experiment without any value judgment are not defamatory. If those processes are corrupted in a way that leads to a conclusion that is defamatory, then the conclusion can be held defamatory.

The two remaining statements at issue are the heart of the case. They are both conclusions that the authors reached that Containment Tech's turbulent-flow CAI device is inferior to the unidirectional flow devices:

> "The performance of four unidirectional-flow CAIs supports their use in pharmacy and nursing CSP operations, whereas the performance of one turbulent-flow CAI does not."

> "As a factor in realistic CSP process design and execution, the alcohol disinfectant drying times observed in the turbulent-flow CAI are excessive to the point of either causing undue delay of the process or encouraging premature resumption of the process before complete drying, and the maximum plasmolysis of potential viable surface contaminants can occur. Neither scenario is acceptable in terms of customary pharmacy workload or patient safety."

ASHP argues that each of these statements is merely "a statement of opinion." "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend on its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). To that extent, if ASHP honestly

thought that the authors' process was appropriate and that the authors honestly interpreted those results to show that Containment Tech's MIC device is inferior, then stating those "opinions" is not defamation.  At the same time, defamation cannot be cloaked merely be prefacing the statement with "I believe."  *Sullivan v. Conway*, 157 F.3d at 1097 ("It is true that prefacing a defamatory statement with the qualification, 'In my opinion,' does not shield a defendant from liability for defamation.  The test is whether a reasonable listener would take him to be basing his 'opinion' on knowledge of facts of the sort that can be evaluated in a defamation suit.").  Where the conclusions are reported as the result of scientific testing, a reasonable jury could find that these two conclusions had defamatory content.

II.    *Matter of Public Concern*

Finding potential defamatory content is only the first step for plaintiffs, however.  The Indiana Supreme Court has been more protective of free speech than the United States Supreme Court and has held that actual malice is required in defamation cases brought by private individuals for statements made about matters of "public or general concern."  *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d at 452, adopting the rule of *Aafco Heating & Air Conditioning v. Northwest Publications*, 321 N.E.2d 580 (Ind. App. 1974); see *Jean v. Dugan*, 20 F.3d at 262 ("it is perfectly appropriate for the states to give speakers greater protection than the United States Constitution requires"); *Filippo v. Lee Publications, Inc.*, 485 F. Supp. 2d 969, 973 (N.D. Ind. 2007) (summarizing

Indiana's additional protection). Actual malice must be shown by "clear and convincing evidence." *Bandido's*, 712 N.E.2d at 456.

The next question is whether the article addressed a matter "of public and general concern," and whether the Indiana anti-SLAPP statute applies. The article here appeared in a national journal and dealt with a serious health issue, the efficacy of devices designed to sterilize injectable pharmaceuticals. The safety of medical devices is undoubtedly one of both general and public concern. See, *e.g.*, *St. Margaret Mercy Healthcare Centers, Inc. v. Ho*, 663 N.E.2d 1220, 1224 (Ind. App. 1996) ("The public interest includes a wide range of considerations including health and the availability of health care."); *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 321 N.E.2d 580 (Ind. App. 1974) (circumstances surrounding a residential fire were matter of public concern); *Filippo* 485 F. Supp. 2d at 974 (collecting Indiana cases where matters were deemed of public concern); see also *Moore v. University of Notre Dame*, 968 F. Supp. 1330, 1338 (N.D. Ind. 1997) (Sharp, J.)("it is this court's opinion that football, and specifically Notre Dame football is a matter of public interest").

To avoid this conclusion, Containment Tech argues that the article was merely "an effort to fail the MIC, and only the MIC, in an eminent industry journal." Pl. Br., Dkt. 121 at 18. This argument confuses the subject matter inquiry, which asks objectively whether the article addressed a matter of general or public concern, with an inquiry into the defendants' subjective intentions. To

the extent that Containment Tech cites case law, it distinguishes cases where defamation was not found, *Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996), or that did not actually confront the issue of public concern. *Sullivan v. Conway*, 157 F.3d 1092, 1097 (7th Cir. 1998) (noting that couching a potentially defamatory comment as an opinion does not shield it from defamation laws but not mentioning the issue of public concern and not finding defamation). Containment Tech's argument about the defendants' motives does not undermine the fact that the article addressed an issue of public concern.

Since the actual malice standard applies, Containment Tech must show that a false statement in the article was published "with knowledge of its falsity or with reckless disregard of whether it was false." *Aafco*, 321 N.E.2d at 586. Whether there is sufficient evidence to support a finding of actual malice is a question of law. *Bandido*'s, 712 N.E.2d at 456. Reckless disregard can be found where there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.*, quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). As a result, the issue is not whether the defendants had some inkling a statement was not true. Plaintiff Containment Tech must come forward with evidence that the defendants either knew that a statement was false or "entertained serious doubts" about the truth of the statement.

III.    *ASHP's Lack of Malice*

For the claims against ASHP, the key question becomes whether Containment Tech has come forward with evidence that would allow a reasonable jury to find, by clear and convincing evidence, that ASHP published defamatory conclusions with actual malice, that is, with reckless or knowing disregard for the truth.  The undisputed facts show that Containment Tech cannot make such a showing against ASHP in this case.

ASHP is a journal of all pharmacists, not just experts in the world of CAI devices.  When the journal receives potential articles, those articles are sent to peer reviewers.  Dr. Hasegawa was assigned to evaluate the manuscript.  Not an expert in this particular field, he decided to send the article to peer reviewers.  He chose peer reviewers who he knew had expertise in sterile compounding.  Hasegawa Decl. ¶ 14.   Four peer reviewers agreed to review the authors' manuscripts.

The responses from the peer reviewers were powerful and positive.  Language such as "critically important work," a "high priority for publication," "critically needed" and "a badly needed piece of information" certainly indicated that the article had value and not that its underlying work had been doctored so as to defame Containment Tech.  With four peer reviewers speaking to the value of the article, the Manuscript Development Group approved the article for publication.  Talley Decl. ¶ 17.  Among four peer reviewers, only one raised a

-29-

substantive issue about the process behind the article, suggesting that alcohol drying times were a controversial measure of effectiveness.

Containment Tech attempts to undermine ASHP's reliance on the peer reviewers because the published paper was not peer reviewed in that final form. Containment Tech points out changes from the original manuscript that was peer reviewed to the final published version.  These arguments are not persuasive. First, ASHP was not required to use peer reviewers at every stage of the process. The stated policy for publication of hundreds of articles is to use peer reviewers to review initial manuscripts.  The lack of peer review of the final version is not a sign of recklessness.  Even if the statements that Containment Tech highlights were false, that falsity would not show actual malice on the part of ASHP.  ASHP followed its usual pattern and practice of peer review.  The peer reviewers were overwhelmingly positive about the initial manuscript.  In no way was ASHP showing a knowing or reckless disregard for the truth by publishing the edited article that contained the allegedly false statements.[5]

---

[5]Containment Tech complains, for instance, about the authors' use of the phrase "CETA standard."   In fact, Containment Tech argues, the CETA qualification process should be identified as a "referenced guidance."   While technically correct, the article remains "substantially true."  See *Heeb v. Smith*, 613 N.E.2d 416, 421 (Ind. App. 1993) ("The test for determining whether a statement is substantially true is whether any inaccuracies caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken.")  Maybe "standard" has a particular meaning, but in CETA's disclaimer, it does not specifically state that it does not intend to set a "standard" but says instead that "it is not the intention to set the *specific acceptance criteria*." Madsen Decl. ¶ 15 (emphasis added).

Containment Tech's efforts to undermine the peer review process are necessary because otherwise it is left arguing that despite four different expert opinions validating the methodology of the study, Containment Tech believes that ASHP defamed it because Containment Tech "warned ASHP that the Authors did not have [Containment Tech's] protocols for validating its MIC and that any tests performed on the MIC without those protocols would lead to false results." Pl. Br., Dkt. 121 at 19. This argument simply cannot stand as the basis for a defamation claim. In effect, Containment Tech argues that any testing done without its permission is invalid and cannot be published without the risk of litigation. And Containment Tech refused to provide those protocols to the authors! It could not first refuse to provide the protocols and then sue because the researchers did not use them. Containment Tech's stated reason for refusing to provide the protocols was fear that Peters, who once had a relationship with NuAire, would share the information. The parties could have dealt with that risk through a confidentiality agreement, which if breached would have entitled Containment Tech to damages. If Containment Tech thought that was insufficient protection, it could not effectively prohibit Peters (or any other researcher) from studying and testing its product and then publishing the findings. Containment Tech must live with the consequences of this study. To hold otherwise would give parties with a financial interest a stranglehold on scientific study.

While Containment Tech may have had legitimate concerns about Peters, this rationale for defamation – the authors did not have the proper protocols –

would apply equally to any situation where the manufacturer refused to cooperate with a test.  If Containment Tech were in fact making an inferior product, it could simply refuse to participate with any researchers and then sue for defamation based on the results of the study.  The fact that the authors did not have the protocols that Containment Tech claims were proper is not grounds for finding defamation against the publisher of the article, ASHP.[6]

For the sake of summary judgment, the court assumes that Containment Tech believes that Peters was not an independent scientific investigator.  Whether or not Peters did legitimate work, ASHP is protected under an actual malice standard by the peer review process and its results, and by the absence of evidence of actual malice.  The experts in the field all recommended publication. In the eyes of Dr. Hasegawa and Talley, this paper was not, as Rahe wrote to Dr. Hasegawa, an "attempt to create a marketing piece with rigged data."  Dkt. 122, Ex. Z.  The only negative feedback came from Containment Tech itself.  Crucially, Containment Tech refused even to review the article or to highlight the alleged deficiencies it now sets out before the court.   Containment Tech merely complained that the authors did not have the proper protocols (which Containment Tech had refused to supply) and then accused Peters of a conflict of

---

[6]In fact, the final article included Containment Tech's demanded disclaimer: "Testing was performed without Containment Tech-approved protocols or training for operation of the MIC."  Article at 625.  The article also noted that Containment Tech did not provide "(1) an MIC unit for testing, (2) proprietary MIC operating and sterilization protocols, or (3) proprietary studies supporting the MIC unit's design and operational qualifications."  *Id.* at 630, n. a.

interest.  ASHP knew about the conflict, but given four supporting peer reviewers who had *actually read* the manuscript, ASHP did not act with actual malice in going forward despite the concerns raised by Containment Tech.

One final issue concerning ASHP is the argument about alcohol-drying times.  Reviewer 3 raised concerns about the use of those tests as a measure of effectiveness, so ASHP was aware of an issue there.  Dr. Hasegawa asked the authors for a response.  The authors responded with a justification that Dr. Hasegawa found reasonable.  Dkt. 114, Ex. O.  Containment Tech has offered no reason to treat Dr. Hasegawa's response as reckless.  Additionally, the other three peer reviewers raised no such concerns with the alcohol drying time, and even the reviewer who raised the issue stated that it was not "cut and dried."  That reviewer complained about the references in that section of the article, and the authors improved their references.  This sort of academic dispute is simply not evidence of reckless or knowing disregard of the truth required for a finding of defamation against the publisher.  The authors appear to be making a reasonable argument with regards to the alcohol drying time.  Containment Tech disagrees, but the argument does not seem absurd to this court, or to the other three peer reviewers.  If the authors' assumptions are incorrect, then the best place to prove that is in the academic world itself.  See *Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996) (noting that "judges are not well equipped to resolve academic controversies . . . and scholars have their own remedies for unfair criticisms of their work – the

publication of a rebuttal.").   For these reasons, ASHP is entitled to summary
judgment on all defamation claims.

IV.     *The Authors' Lack of Malice*

The next question is whether Containment Tech has offered evidence that
would allow a reasonable jury to find by clear and convincing evidence that the
authors wrote defamatory conclusions that they knew were false or acted with
reckless disregard for the truth.

At this point, the two allegedly defamatory statements remaining in
Containment Tech's case against the authors are the article's core conclusion and
the statement about alcohol drying times.  If the authors are fully believed, their
overall conclusions cannot be defamatory because they merely undertook a
scientific study and reported their results.   Containment Tech's apparent
contention is that the authors were specifically trying to create a research piece
that unfairly tarnished Containment Tech.  Otherwise Containment Tech has no
claim for defamation.  The scientific problems it alleges with the experiment's
design, if benign, might allow for effective rebuttal, but they do not show actual
malice.  Bad but honest science is not actionable as defamation.[7]

---

[7]The court is not suggesting the science was actually bad or that the
conclusions were false.  For purposes of summary judgment, however, the court
must assume that the methods and conclusions were flawed, as plaintiff's expert
witness Madsen testified.

To bolster its case about the inadequacies of the authors' methods, Containment Tech has submitted an affidavit from Russell Madsen, President of The Williamsburg Group, a pharmaceutical consulting group. Madsen believes that: "The study described in the Article is not scientifically valid . . . ." Madsen Decl. ¶ 9. He highlights what he considers to be the incorrect steps and assumptions taken by the authors. In total, Madsen questions twenty assertions by the authors. Seventeen of these were used as the defamatory statements that Containment Tech raised in its response briefs. Only one allegedly defamatory statement raised by Containment Tech in its response briefs was not identified by Madsen.

While Madsen's affidavit obviously fills an important role in showing that the authors' conclusions are not unanimous, it does not provide sufficient evidence that would allow a jury to find by clear and convincing evidence that the authors acted with actual malice. Containment Tech's unwillingness to cooperate with the authors, while perhaps understandable, makes it impossible to hold the authors liable merely for not following the manufacturer's preferred protocols. Even more damaging to Containment Tech's claim is the authors' attempt to receive feedback after the initial draft was accepted for publication. At that point, all plaintiff's Rahe had to do was guarantee confidentiality. Containment Tech then would have been free to comment on the study as it deemed necessary. If Containment Tech had agreed to confidentiality, paid Madsen to review the article, and provided Madsen's affidavit to the defendants before publication, the

defendants' response to such criticism before publication might have made this a different case.  But Rahe's opposition was based purely on his insistence that Peters was "biased" and that the authors did not have the proper protocols.[8]

The only cognizable way that Containment Tech could show actual malice would if the entire study was rigged specifically to fail the MIC device with the intention of publishing an article that the authors knew would be false when they designed the study.  It is true that "[s]cientific controversies must be settled by the methods of science rather than litigation."  *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).  If the authors had rigged the study, however, it would not have been science, and deliberately or recklessly false conclusions could be actionable.

But the theory requires evidence, not speculation.  In the end, Containment Tech just does not have sufficient evidence to argue that this is anything more than a scientific dispute.  The authors undoubtedly think that the MIC is a flawed device.  Perhaps they held that belief before they designed the study.  That is not evidence of defamation:

---

[8]Containment Tech's bias argument is misplaced.  While Peters' previous affiliation with Nu-Aire is a potential conflict of interest, Containment Tech seems to believe that everyone who thinks the MIC is an inferior product is "biased."  If a person studies a product and comes to believe that it is not a good product, this is not evidence of bias.  Weiss, for instance, did not have even an arguable financial incentive to disparage Containment Tech, but he clearly believed, even before the study, that the MIC was flawed.  Weiss Decl. ¶ 14. His skepticism about the product does not make him "biased" against Containment Tech.

> A person who concludes that a public figure is a knave may shout that conclusion from the mountain tops.  Both [defendants] came to believe that [plaintiff] is a hired gun who makes a living by deceiving judges about the state of medical knowledge and thus assisting child molesters to evade punishment.  Persons who hold such opinions cannot be expected to look kindly on their subjects, and the law certainly does not insist that they shut up as soon as they are challenged.

*Underwager*, 22 F.3d at 736.

In an attempt to show intentional wrongdoing, Containment Tech emphasizes the fact that Peters and McKeon lost the protocols they used for testing.  Containment Tech urges a spoliation finding based on these lost protocols.  The authors cannot explain where this data has gone, but the problem for Containment Tech is the data just is not particularly revealing.  Crucially, the actual raw data has been presented.  Peters Suppl. Decl., Ex. A.  The testing protocols have not been found, but Peters had run similar tests before, described the methodology in the paper, and testified under oath as to what the procedures were.  Containment Tech has no contrary evidence.  The record here does not show that Containment Tech has repeated the defendants' tests and shown them to be false.

With regard to the alcohol drying time, Containment Tech argues that the lengthened drying time for the MIC is "more efficacious" than the shorter times for the unidirectional-airflow CAIs.  Pl. Br., Dkt. 135 at 28.  The theory is that the longer drying times mean longer contact with alcohol will kill more bacteria.  This proposition seems reasonable, and Madsen supports it.  The authors' response is

that the longer drying times are less efficient, and technicians are likely not to wait sufficiently before starting the process.   The evidence shows beyond reasonable dispute that this is an honest disagreement that does not rise to the level of reckless disregard for the truth.

This court is not competent to make a final judgment on the relative merits of the different CAI devices, but it can certainly judge in this case that, at least, an honest academic dispute exists in the pharmacy world as to whether Containment Tech's turbulent-flow MIC device is as effective as the unidirectional-airflow devices.   Four separate peer reviewers found the authors' methods appropriate and their conclusions valid.   Additionally, Weiss consulted three co-workers at the Mayo Clinic who supported publication.   Weiss Decl. ¶ 30.   Three peer reviewers found their alcohol drying time study appropriate.[9]   The article has been published in a widely read journal and had received (as of the time of depositions) no negative feedback.   Madsen's affidavit  shows at most that others in the field can disagree with the conclusions, but Containment Tech would be better served to turn those findings into a rebuttal piece and let the scientific community make its own determinations on the merits.   See *Lott v. Levitt*, 556 F.3d 564, 570 (7th Cir. 2009) ("To the extent that [plaintiff] is complaining about an attack on his ideas, and not his character, he is barking up the wrong tree.

---

[9]The fact that peer reviewer 3 raised questions about the alcohol drying time actually hurts Containment Tech's case.   The disagreement shows that the reviewer took the review seriously and was not looking to flunk Containment Tech's MIC device.

The remedy for this kind of academic is the publication of a rebuttal, not an award of damages."); *Dilworth*, 75 F.3d at 310 ("scholars have their own remedies for unfair criticisms of their work – the publication of a rebuttal.  Unlike the ordinary citizen, a scholar generally has ready access to the same media by which he is allegedly defamed.").

The court is fully aware that the case is before the court on motions for summary judgment.  The negative analysis by Madsen does show that the authors' position is not universal.  The unexplained disappearance of the test folder could be suspicious, but the underlying data are still available.   An academic dispute and data retention problems that create no prejudice, however, are not evidence of defamation in Indiana.  In a defamation case involving a matter of public concern, Indiana law requires actual malice.  Under this standard, the First Amendment interests are too important for a normal summary judgment analysis:

> The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact.  Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Bose Corp. v. Consumers Union of United States., Inc.*, 466 U.S. 485, 510-11 (1984). In this case, a reasonable jury could find at most only an honest academic dispute, not reckless disregard for the truth.  Defendants have shown that their

speech was "lawful."  Under Indiana's anti-SLAPP law, they are entitled to a dismissal of the suit and attorney fees.  Quite simply, this battle should take place in the pages of the ASHP journal and similar publications, not in a court.

*Conclusion*

For the foregoing reason, all defendants' motions to dismiss under Indiana's Anti-SLAPP statute (Dkts. 98 and 112) are granted.  Attorney fees and costs under Ind. Code § 34-7-7-7 for prevailing defendants are appropriate.  Defendants have four weeks from the date of this entry to submit a fee petition.  At that point, plaintiffs have four weeks to object.  This court can decide the fee petitions on the papers but will hold a hearing if requested by any party.

So ordered.

Date: March 26, 2009

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Steven M. Badger
BOSE MCKINNEY & EVANS, LLP
sbadger@boselaw.com

Jan M. Carroll
BARNES & THORNBURG, LLP
jan.carroll@btlaw.com

Anne L. Cowgur
BINGHAM MCHALE, LLP
acowgur@binghammchale.com

Geoffrey B. Davis
DUE DOYLE FANNING & METZGER
gdavis@duedoyle.com

Danford Royce Due
DUE DOYLE FANNING & METZGER
ddue@duedoyle.com

Kellie M. Johnson
BOSE MCKINNEY & EVANS, LLP
kjohnson@boselaw.com

Daniel P. King
FROST BROWN TODD, LLC
dking@fbtlaw.com

Kara M. Moorcroft
BARNES & THORNBURG, LLP
kara.moorcroft@btlaw.com

Kelly Michelle Scanlan
BOSE MCKINNEY & EVANS, LLP
kscanlan@boselaw.com

Joel E. Tragesser
FROST BROWN TODD, LLC
jtragesser@fbtlaw.com

T. Joseph Wendt
BARNES & THORNBURG, LLP
jwendt@btlaw.com